IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

ELLIOT VERA-NATAL,             )
                                     )     No. 05 C 1500
         Petitioner,         )
                                     )     Judge Mark Filip
            v.                )
                                     )
DONALD HULICK,            )
                                     )
         Respondent.      )

## MEMORANDUM OPINION AND ORDER DISMISSING
## PETITION FOR WRIT OF HABEAS CORPUS

Petitioner, Elliot Vera-Natal ("Petitioner" or "Vera-Natal"), seeks a writ of habeas corpus

against Respondent, Donald Hulick, Warden of the Hill Correctional Center in Galesburg,

Illinois. For the reasons stated below, Vera-Natal's petition for a writ of habeas corpus

("Petition") is respectfully denied.

## BACKGROUND

Petitioner is imprisoned pursuant to a judgment of the Illinois courts. That judgment

followed a bench trial in which Vera-Natal was convicted of first-degree murder and attempted

first-degree murder and was sentenced to consecutive prison terms of thirty and eight years,

respectively.[1] (D.E. 15, Ex. B at 1, 15.)[2]

On April 17, 1998, Vera-Natal traveled on a red bicycle to a gas station in Waukegan,

Illinois. (*Id.* at 2.) Some members of the Maniac Latin Disciples street gang, none of whom was

---

[1]     The Court has taken the facts from the Illinois appellate court's resolution of Petitioner's
direct and post-conviction appeals. *Accord, e.g., Ashford v. Gilmore*, 167 F.3d 1130, 1131 (7th
Cir. 1999) (citing 28 U.S.C. § 2254(e)(1)).

[2]     Docket entries are designated as "D.E. ___," followed by the appropriate district court
docket number.

armed, were in and around a white van parked outside of the gas-station store. (*Id.* at 2, 21.) Vera-Natal (who also went by the nickname "Big Tiny"), was a member of the Spanish Cobras street gang, one of the rivals of the Maniac Latin Disciples. (*Id.* at 21.) Vera-Natal exchanged stares with at least two of the Maniac Latin Disciples. (*Id.* at 6, 21.) Brian Vinson ("Vinson") and at least one other person in the van also flashed "signs" and exchanged words with Vera-Natal. (*Id.* at 21.)

After these exchanges, Petitioner rode his bike closer to his eventual shooting victims and placed his hand at his waist. (*Id.*) Vinson, while standing near the van, threw a bottle of transmission fluid at Vera-Natal; the bottle did not hit Petitioner. (*Id.*) In response, Petitioner got off his bike, drew a .38 caliber firearm from his waistband, and repeatedly fired at Vinson and the others in the van. (*Id.*) Eyewitness testimony and the position of the shell casings showed that Vera-Natal was walking toward the van as he fired. (*Id.*) Vera-Natal's shots killed Jose Perez ("Perez") and wounded Vinson. Perez sustained a fatal gunshot wound to his side, while Vinson sustained a gunshot wound to the ankle that required surgery. (*Id.* at 21, 32.) Vinson could not work for several weeks as a result of his injury. (*Id.* at 21, 32.)

After the shootings, Vera-Natal fled the gas station, discarded the gun in an alley gutter, and went into hiding. (*Id.* at 18.) Two days after the incident, Vera-Natal flew from Chicago to Puerto Rico under the alias "Alvin Gonzalez." (*Id.* at 3, 18.) Petitioner made no return flight arrangements. (*Id.*) Petitioner was arrested three months later in Puerto Rico on unrelated charges. (*Id.*) On October 21, 1998, a grand jury in Lake County, Illinois, indicted Vera-Natal for the shootings at the gas station. (*Id.*) On February 2, 1999, Vera-Natal waived extradition, and he was transported back to Illinois two weeks later. (*Id.*)

2

The evidence that Vera-Natal shot the victims was overwhelming; the only issue at trial was the "imperfect self-defense" argument offered on behalf of Vera-Natal by his counsel.[3] (*Id.* at 20.) Vera-Natal confessed to the Waukegan police that he fired shots at the van and stated that he shot at the van because he was "scared for his life" because "the Maniacs were looking for him." (*Id.* at 17.) Vera-Natal contended that he feared for his life ever since he had discovered that the Maniac Latin Disciples had allegedly put out an "SOS" on him—an order from the leaders of the gang to shoot Vera-Natal on sight. (*Id.* at 16-17.)

A number of eyewitnesses confirmed Vera-Natal's identity as the shooter—either through pretrial photospread identifications; in-court identifications; and/or testimony in which they described the shooter's appearance and clothing, which matched testimony describing Vera-Natal's appearance on the day of the shootings. (*See, e.g., id.* at 4, 5, 9, 11, 13, 14.) In the latter regard, several witnesses identified the shooter as a man wearing a baby blue shirt and a baseball cap tilted to the left who had been riding a red bicycle. (*See, e.g., id.* at 4, 7, 9, 11.) (Witnesses explained that the baby blue or powder blue shirt is a symbol of Vera-Natal's Spanish Cobras street gang, and that wearing a cap with the brim tilted to the left is a symbol of disrespect towards the Maniac Latin Disciples. (*See, e.g., id.* at 9-11).) Other witnesses testified that Vera-Natal was wearing a pale blue shirt and a tilted baseball cap and was riding a red bicycle at or around the time of the incident. (*See, e.g., id.* at 3-4, 7, 9, 11.) Vera-Natal did not testify. (*Id.* at 20.) His attorney argued that Vera-Natal had an unreasonable belief that his use of force was justified, and therefore a second-degree murder conviction was appropriate. (*Id.* at 20.)

---

[3]     Under 720 ILCS 5/9-2, a person commits second degree murder when: (1) he commits the offense of first degree murder; (2) at the time of the murder, he believes the circumstances to be such that, if they existed, would justify or exonerate the killing; and (3) his belief is unreasonable.

3

After deliberating, the trial court found Petitioner guilty on all of the counts of the indictment and entered judgment on one count of first-degree murder and one count of attempted first-degree murder. (*Id.* at 22.) In rejecting Petitioner's imperfect self-defense claim, "the trial court made detailed findings of fact." (*Id.* at 20.) The trial court/factfinder rejected Vera-Natal's defense on the basis of, *inter alia*, the following evidence: (1) Vera-Natal wore apparel symbolizing his gang and antagonistic to the Maniac Latin Disciples at the time of the shootings; (2) he carried a gun with him to the gas station; (3) none of the Maniac Latin Disciples at the gas station was armed; and (4) Vera-Natal walked toward and closed on the van as he fired the shots. (*Id.* at 22.) The trial court also rejected the contention that the existing rivalry between the two gangs, prior gang incidents, and the purported S.O.S. order established that Petitioner feared for his life when he closed on the van and repeatedly fired on it. (*Id.*) Instead, "[t]he [trial] court concluded that defendant [*i.e.*, the Petitioner] fired simply because he was angry at members of a rival gang." (*Id.*)

The trial court scheduled a sentencing hearing and ordered a pre-sentence investigation. (*Id.*) As part of the pre-sentence investigation ordered by the Court, Petitioner was examined by two mental health professionals. (*Id.* at 22-23.) The first, Dr. Karen Chantry, observed symptoms that, in her view, suggested "a strong possibility of neurological impairment and/or a seizure disorder such as temporal lobe epilepsy." (*Id.* at 23.) She referred Petitioner to a psychologist specializing in neuropsychology to examine him for any neurological impairment. (*Id.*) That psychologist, Dr. Elizabeth Thompson, determined that Petitioner was deficient in "executive functioning," and further stated that "defects in executive functioning can cause a person to misjudge social situations and act irrationally and impulsively." (*Id.* at 24.) Dr. Thompson also explained that if the Petitioner were taken out of his "normal structure," "he will

4

make poor decisions." (*Id.*) In offering these observations, Dr. Thompson acknowledged that she did not read any of the police reports related to the shooting and that she had no experience in forensic analysis of first degree or second degree murder cases. (*Id.* at 24-25.) She also admitted that Petitioner's normal structure appeared to be gang culture. (*Id.* at 25.)

At sentencing, the trial court denied Petitioner's motion for a new trial, stating that the putative evidence of his neurological impairment would not have changed the court's findings or verdict on the first-degree murder and first-degree attempted murder charges. (*Id.* at 25.) The court sentenced Petitioner to thirty years on the first-degree murder conviction and eight years on the attempt conviction. (*Id.*) The court, after finding that Petitioner inflicted severe bodily injury on his murder victim, ordered the sentences to run consecutively pursuant to 720 ILCS 5/8-4(a).

On direct appeal, Petitioner argued: (1) his convictions for first-degree murder and attempted first-degree murder should both be reduced from first to second degree because he met the criteria for "imperfect" self-defense; (2) he should receive credit against his sentence for his time in custody after he waived extradition from Puerto Rico; and (3) the imposition of consecutive sentences under 5/8-4(a) violated the constitutional requirements set forth in *Apprendi v. New Jersey*, 530 U.S. 466 (2000). (D.E. 15, Ex. B at 1-2.) The appellate court agreed that Vera-Natal should receive credit for time in custody after he waived extradition, but rejected his two other claims. (*Id.* at 33.) The appellate court affirmed the trial court's factual findings that Petitioner did not believe in the need for self-defense so as to warrant the shootings, and that Petitioner could not have believed his response to Vinson's aggression was proportionate. (*Id.* at 27.) In fact, the Illinois Court of Appeals stated that "[w]e agree with the trial court that defendant did not believe in the need for self-defense when he confronted Vinson and the others at the Mobil station. Even if we were to assume that defendant could believe that

5

Vinson became the initial aggressor in the encounter by throwing a plastic bottle at defendant, we could not conclude that defendant believed that his response to Vinson's aggression was proportionate." (*Id.*)[4] The appellate court also determined that the generic evidence concerning Vera-Natal's potential neurological defects did not explain or legally mitigate his response to the specific situation he encountered just before he shot the victims. (*Id.* at 30.) Finally, the court of appeals observed that the Illinois Supreme Court has ruled that the offense of attempted second-degree murder does not exist in Illinois. (*Id.* at 31.)

The appellate court also rejected Petitioner's *Apprendi* challenge to his consecutive sentences. The appellate court noted that the Illinois Supreme Court decided *People v. Carney*, 752 N.E.2d 1137 (Ill. 2001), while Petitioner's appeal was pending; *Carney* squarely addressed and rejected a claim virtually identical to Petitioner's claim. (D.E. 15, Ex. B at 31.) Because decisions by the Illinois Supreme Court apply to all pending cases unless the opinion directs otherwise, the appellate court applied *Carney* to Petitioner's *Apprendi* claim and rejected the claim. (*Id.*) The appellate court also determined that Petitioner inflicted severe bodily injury on

---

[4]    *See also id.* at 28 ("The record supports the trial court's finding that neither Vinson nor anyone inside the van was armed. Further, defendant nowhere indicated in his conversation with Sergeant Oliver [of the Waukegan Police Department] that he believed Vinson or any of the others was armed. The use of deadly force against an unarmed aggressor is permissible only where it appears that the aggressor is capable of inflicting serious bodily harm without the use of a deadly weapon, and is intending to do so. There is no indication in the record that defendant believed Vinson or the others could inflict serious bodily harm with a plastic bottle or with whatever non-deadly weapon he suspected or believed they had at their disposal. [. . . .] Further, defendant's inability to articulate to Sergeant Oliver why he felt in fear of his life . . . was additional indication that defendant did not in fact have such a fear on that date.") (numerous Illinois caselaw citations omitted); *id.* at 30 ("Defendant's recognition of Lopez as a Maniac [Latin Disciple] hardly warranted him in spraying the van with gunfire given that Lopez, by all accounts, had shown absolutely no aggression toward defendant at any time before or on April 17, 1998"); *id.* ("We follow the trial court in concluding that defendant intentionally killed Lopez and wounded Vinson simply out of anger for Vinson's throwing the bottle at him or because Vinson or someone else had flashed antagonistic gang signs. Therefore, we hold that the trial court rationally could find defendant guilty of first degree murder.").

6

his attempted-murder victim within the meaning of Illinois law because Vinson missed several weeks of work due to his ankle injury and resultant surgery. (*Id.* at 32 (discussing Illinois statutory provisions and caselaw).)

Petitioner filed a petition for leave to appeal with the Illinois Supreme Court that advanced the following claims: (1) the trial court denied him due process when it "misinterpreted" his affirmative defense; (2) the trial court erred when it applied the wrong burden of proof and failed to consider mitigating evidence; (3) the trial court abused its discretion when it determined that the evidence concerning his neurological disorder would not have changed the verdict; (4) the appellate court erred when it determined that Illinois does not recognize the crime of attempted second-degree murder; and (5) *Apprendi* invalidates the consecutive sentences imposed by the trial court. (*Id.*, Ex. C.) The Illinois Supreme Court denied his petition on May 30, 2002. (*Id.*, Ex. D.)

Petitioner subsequently filed a post-conviction petition in the circuit court on June 10, 2002. (D.E. 15, Ex. E.) The post-conviction petition raised the following claims: (1) ineffective assistance of trial counsel; (2) ineffective assistance of appellate counsel; (3) his sentence was disproportionate to the crime and to the sentences of other defendants in unrelated cases; and (4) the trial court relied upon improper aggravating factors at sentencing. (*Id.*) On July 31, 2002, the circuit court issued a written order dismissing the petition as frivolous and patently without merit. (D.E. 15, Ex. F.) Petitioner appealed the circuit court's denial of post-conviction relief. (D.E. 14, Ex. G.) The only issue raised in his appeal was that the mandatory consecutive sentences were based on the "severe bodily injury" inflicted upon the murder victim Lopez, not Vinson, who was the victim of attempted murder. (*Id.* at 4.) This claim was based entirely upon state law and did not raise any federal constitutional issues. The appellate court affirmed the

dismissal of Petitioner's post-conviction plea for relief, finding that even though the trial court's reasoning was in error (it had explained that consecutive sentences were appropriate because Petitioner inflicted "severe bodily injury" on his murder victim, and murder is not a qualifying offense for this enhancement (*id.* at 3-4), presumably because every murder victim suffers such an injury), the consecutive sentences were nonetheless proper and required under Illinois law. (*Id.*) In this regard, the Illinois Court of Appeals explained that

> [D]espite the trial court's error, the consecutive sentences are not void. On the contrary, the consecutive sentences are still mandatory, as defendant did inflict severe bodily injury on Vinson [the attempted murder victim] during the commission of the attempted first-degree murder. [. . . .] Thus, although the trial court's stated justification was improper, its imposition of consecutive sentences was not only proper but required. Indeed, were we to grant defendant's request to make his sentences concurrent, <u>our</u> judgment would be void. See <u>People v. Arna</u>, 168 Ill. 2d 107, 113 (1995) (concurrent sentences are void when consecutive sentences are mandatory).

(*Id.* (underlining in original).)

Petitioner filed a petition for leave to appeal his post-conviction denial of relief to the Illinois Supreme Court. Petitioner raised a single claim—that his consecutive sentences were void because the trial and appellate courts misconstrued state law. (D.E. 15, Ex. K.) While the caption claimed this was a violation of his rights under the Eighth and Fourteenth Amendments, the argument cited no federal cases or principles of law, nor did it explain why the concurrent sentences were cruel and unusual punishment. The Illinois Supreme Court denied his petition for leave to appeal on October 6, 2004. (D.E. 15, Ex. L.) On March 14, 2005, Petitioner filed a *pro se* petition for a writ of habeas corpus, pursuant to 28 U.S.C. § 2254. As explained below, the petition is respectfully rejected.

I.     Standard of Review

The grounds upon which a federal district court may issue a writ of habeas corpus for a person imprisoned pursuant to a state court criminal judgment are subject to meaningful limits.

8

First, habeas relief can be granted "only on the ground that [a prisoner] is in custody in violation of the Constitution or laws or treaties of the United States." 28 U.S.C. § 2254(a). The Court cannot grant habeas relief on the grounds that a state court incorrectly applied state law, except to the extent that such application also violated federal law. *See Dellinger v. Bowen*, 301 F.3d 758, 764 (7th Cir. 2002) ("Federal habeas relief is only available to a person in custody in violation of the United States Constitution or laws or treaties of the United States, *see* 28 U.S.C. § 2254(a), and is unavailable to remedy errors of state law.").

Second, the Court may not provide habeas relief unless Petitioner has exhausted his available remedies in state courts. 28 U.S.C. § 2254(b)(1)(A). Exhaustion occurs when the petitioner has fairly presented his claim to the state courts by arguing both the federal legal principles and the salient and operative facts of the claim, thereby giving the state courts a "meaningful opportunity to pass upon the substance of the claims later presented in federal court." *Chambers v. McCaughtry,* 264 F.3d 732, 737-38 (7th Cir. 2001) (collecting cases) (internal quotation marks and citation omitted).[5] The petition must alert the state courts that the claim relies on a federal constitutional provision such that the state courts had a meaningful opportunity to pass on the claim's substance. *Perruquet v. Briley*, 390 F.3d 505, 513-14 (7th Cir. 2004). Exhausting all state remedies includes presenting each claim on appeal to the Illinois appellate court and in a petition to the Illinois Supreme Court for discretionary review. *See, e.g., O'Sullivan v. Boerckel*, 526 U.S. 838, 845 (1999); *Hadley v. Holmes*, 341 F.3d 661, 664 (7th Cir.

---

[5]      *Accord id.* at 513-14 ("'[W]e have required a state prisoner to present the state courts with the same claim he urges upon the federal courts. Presenting the same claim in state court that he later seeks to make in federal court means that the petitioner must alert the state courts that he is relying on a provision of the federal constitution for relief.") (internal quotation marks and citations omitted); *id.* at 519 ("A petitioner fairly presents his federal claim to the state courts when he articulates both the operative facts and the controlling legal principles on which his claim is based.")

2003) (holding that the rule applies for purposes of habeas corpus under Section 2254). This rule applies to claims presented in petitions for state post-conviction relief, as well as to claims contained in direct appeals from criminal courts. *See, e.g.*, *White v. Godinez*, 192 F.3d 607, 608 (7th Cir. 1999) (*per curiam*).

Third, habeas relief is ordinarily not available for claims that have been "procedurally defaulted" in state proceedings. This means that the Court may not review a claim if "the court to which the petitioner would be required to present his claims in order to meet the exhaustion requirement would now find the claims procedurally barred." *Coleman v. Thompson*, 501 U.S. 722, 735 n.1 (1991). The Court may excuse procedural default when there is cause for the default and prejudice as a result of the alleged violation of federal law or where a refusal to consider the claim would result in a fundamental miscarriage of justice. *See Dellinger*, 301 F.3d at 766. To show cause for a default, Petitioner must offer an excuse that cannot fairly be attributed to him. For example, conduct by a petitioner's counsel that is constitutionally ineffective under *Strickland v. Washington*, 466 U.S. 668 (1984), constitutes cause. However, a claim that, for example, ineffective assistance was sufficient cause for a procedural default can *itself* be procedurally defaulted if it is not properly presented to state courts. *See Edwards v. Carpenter*, 529 U.S. 446, 451-52 (2000); *Dellinger*, 301 F.3d at 766-67.

In order to establish that a fundamental miscarriage of justice has occurred, Petitioner must demonstrate by clear and convincing evidence that, but for the alleged violation of federal law in the state court proceedings, no reasonable juror would have convicted him. *Id.*, 301 F.3d at 767 (citing *Schlup v. Delo*, 513 U.S. 298, 327 (1995)). In other words, the exception is "limited to situations where the constitutional violation has probably resulted in a conviction of one who is actually innocent." *Id.* Due to the prior finding of guilt by the factfinder, a petitioner

10

alleging a fundamental miscarriage of justice bears the burden of proof. *See Buie v. McAdory*, 341 F.3d 623, 626-27 (7th Cir. 2003).

The Antiterrorism and Effective Death Penalty Act ("AEDPA"), 110 Stat. 1214 (1996), placed additional restrictions on federal habeas relief for persons imprisoned pursuant to the judgment of a state court. Prior to AEDPA's enactment, "federal courts disregarded the state court's legal conclusions and reached independent judgments on the issues presented to them, but deferred to the state court's findings of fact." *Agnew v. Leibach*, 250 F.3d 1123, 1128-29 (7th Cir. 2001). Under AEDPA, the state court judgment must violate federal law and it must either be "contrary to, or involve an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States," or be "based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C.§ 2254(d). A judgment is "contrary to" Supreme Court precedent if the state court made a statement of law inconsistent with one made by the Supreme Court, or if the state court decided a case with "materially indistinguishable facts" differently from the Court. *Huynh v. Bowen*, 374 F.3d 546, 548 (7th Cir. 2004) (citing *Williams v. Taylor*, 529 U.S. 362, 413 (2000)).

A state court decision is an "unreasonable application of" clearly established law "'if the state court identifies the correct governing legal principle from the [Supreme] Court's decisions but unreasonably applies that principle to the facts of the prisoner's case.'" *Cossel v. Miller*, 229 F.3d 649, 654 (7th Cir. 2000) (quoting *Williams*, 529 U.S. at 413). As the Seventh Circuit has repeatedly instructed, the unreasonable application prong of Section 2254(d)(1) is "a difficult standard to meet." *Floyd v. Hanks*, 364 F.3d 847, 850 (7th Cir. 2003) (citation omitted); *Jackson v. Frank*, 348 F.3d 658, 662 (7th Cir. 2003) (citation omitted); *see also Hardaway v. Young*, 302 F.3d 757, 762 (7th Cir. 2002) (holding that "unreasonable," for the purpose of Section

2254(d)(1), means "something like lying well outside the boundaries of permissible differences of opinion"). The Court is not permitted to substitute its independent judgment as to the correct outcome; it must only ask if the state-court decision was reasonable. *See Washington v. Smith*, 219 F.3d 620, 628 (7th Cir. 2000); *Huynh*, 374 F.3d at 548 ("An unreasonable application is not simply what we might deem to be an incorrect or erroneous application of federal law.").[6] Thus, for example, with respect to ineffective assistance claims under *Strickland v. Washington*, 466 U.S. 668 (1984), the Seventh Circuit has repeatedly instructed that, in determining reasonableness, this Court must afford great deference to the state courts' application of the *Strickland* standard. *See Murrell v. Frank*, 332 F.3d 1102, 1111 (7th Cir. 2003). The Seventh Circuit has repeatedly taught that, "'*only a clear error* in applying *Strickland* would support a writ of habeas corpus,'" *id.* (quoting *Dixon v. Snyder*, 266 F.3d 693, 700-01 (7th Cir. 2001) (emphasis in *Murrell*), such that the assessment of the state courts' regarding *Strickland* was not even "'minimally consistent with the facts and circumstances of the case.'" *Id.* at 1112 (quoting *Sanchez v. Gilmore*, 189 F.3d 619, 623 (7th Cir. 1999)). Furthermore, a federal habeas court must presume that all of the state court's factual determinations, including credibility determinations, are correct, unless rebutted by clear and convincing evidence. *Id.*

II.    Issues Raised in the Petition

Petitioner seeks habeas relief on the following grounds: (1) the sentencing court erred when it determined that consecutive sentences were mandatory under Illinois sentencing law; (2) his consecutive sentences violate due process under the United States and Illinois constitutions;

---

[6]    Although the Supreme Court has repeatedly instructed that there is a difference between merely an incorrect application of a Supreme Court precedent and an objectively unreasonable one (only the latter being enough to ground habeas relief), in this case the distinction is not material.

and (3) the Illinois circuit court violated his rights under the Fifth, Sixth, and Fourteenth Amendments when it summarily dismissed his ineffective assistance of counsel claim. These contentions are meritless and provide no basis for the Court to grant habeas relief.

A.    Misapplication of Illinois Sentencing Law

Petitioner argues that his consecutive sentences are "void due to process of the law." (D.E. 1 at 5.) Petitioner also casts this claim as involving a right "guaranteed by the Eighth Admendment [sic]." (*Id.* at 9.) This claim was not exhausted because the state courts were not alerted to the federal basis for the claim; it was presented in state court as a state-law issue. Since Illinois law would bar Petitioner from raising this federal constitutional claim in a new state proceeding—*see, e.g., People v. Blair*, 831 N.E.2d 604, 614-15 (collecting authorities and holding that issues that could have been but were not raised on direct appeal generally cannot be raised in post-conviction proceedings)—it is procedurally defaulted. *See, e.g., Coleman*, 501 U.S. at 735 n.1. In addition, this claim is without merit, as it is settled law that consecutive sentences do not violate the Eighth or Fourteenth Amendments. *See Dellinger*, 301 F.3d at 764- 65 & n.6 (rejecting Due Process challenge to Illinois's imposition of consecutive sentences where attempted murder caused severe bodily injury); *Carney*, 752 N.E.2d at 1142; *accord, e.g., Lockyer v. Andrade*, 538 U.S. 63, 74 & n.1 (2001) (rejecting Eighth Amendment challenge on federal habeas review to two consecutive 25-year to life sentences for defendant's theft of approximately $150 in videotapes under California's "three strikes" law); *United States v. Washington*, 109 F.3d 335, 338 (7th Cir. 1997) ("The cruel and unusual punishments clause of the Eighth Amendment permits life imprisonment for a single drug crime.") (citing *Harmelin v. Michigan*, 501 U.S. 957 (1991)).

The substance of Petitioner's claim is that the sentencing court erred when it imposed "a

mandatory consecutive sentence term." (*Id.*) This claim was properly raised in Petitioner's appeal of the denial of his petition for post-conviction relief (D.E. 15, Ex. G at 4), and in his petition for leave to appeal to the Illinois Supreme Court. (*Id.*, Ex. K at 3.) However, this claim concerns the proper construction of an Illinois statute, 720 ILCS 5/5-8-4(a), and Illinois precedent interpreting it, and thus provides no basis for habeas relief. *See, e.g., Dellinger*, 301 F.3d at 764. In addition, to the extent that this Court's views concerning that state law question are even relevant, the claim appears to be clearly meritless. Section 5/5-8-4(a) requires consecutive sentences where an attempted murder causes "serious bodily injury"; the evidence at trial demonstrated that Vinson's injuries, which resulted from Petitioner's attempt to murder him, were so severe that he needed to have surgery and he missed several weeks of work. (D.E. 15, Ex. B at 2, 32.)

    B.    Due Process Violation from Consecutive Sentences

    Vera-Natal argues that the consecutive sentences deprived him of a liberty interest in not being subject to consecutive sentences. This argument is procedurally defaulted because it was not raised in any state court proceeding, and Illinois law would not permit him to raise it in a successive petition.

    This claim also fails on the merits. As an initial matter, the Court notes that Petitioner does not coherently explain the basis or nature of his purported liberty interest upon which the State of Illinois has infringed. As explained further below, the claim appears to be grounded on the assertion that years before the commission of Petitioner's crimes, Illinois had adopted a more lenient statutory sentencing regime, under which Petitioner may not have faced consecutive sentences for first-degree murder of one victim and first-degree attempted murder of another. In this regard, Petitioner does not contend that this former and repealed statutory framework was in

14

existence at the time that he committed the murder and attempted murder for which he is imprisoned now.

Such a due process/liberty claim would be facially deficient if presented as an *ex post facto* claim, which is how claims concerning legislative shifts in the classification and punishment of criminal offenses such as first-degree murder and attempted murder are normally presented. Petitioner was tried, convicted, and sentenced well after the Illinois Legislature amended the Illinois Code to expand the use of consecutive sentences. *See Collins v. Youngblood,* 497 U.S. 37, 41 (1990) (prohibition on *ex post facto* laws only applies when the new legislation punishes as a crime an act previously committed, which was innocent when done; which makes more burdensome the punishment for a crime, after its commission; or which deprives one charged with crime of any defense available according to law at the time when the act was committed) (internal citations omitted).

In order to circumvent this precedent, Petitioner has couched his claim as an alleged due process violation. Although his filing is not crystal clear in this regard, Petitioner suggests that when a state has created a liberty interest, that liberty interest merits due process protections. (*See* D.E. 1 at 6 ("The United States Supreme Court has established principles that must be followed to determine when a state statute has created a right or liberty interest, which required due process protections." (citing *Connecticut Bd. of Pardons v. Dumschat,* 452 U.S. 458 (1981) (certain internal capitalization omitted for clarity)).) The Court can readily assume that premise *arguendo,* but it is of no help to Petitioner. The State of Illinois has a statute that deals with sentencing, and the Illinois Court of Appeals twice determined that the statute was properly applied in affirming the sentence for Petitioner's first-degree murder and first-degree attempted murder convictions. Petitioner cites no authority even to suggest that the Fourteenth Amendment

places limits on a state's ability to amend, reform, or change its statutory sentencing provisions for first-degree murder and attempted murder—at least outside of, for example, limits otherwise imposed by Eighth Amendment jurisprudence, which are not implicated here. Nor does Petitioner present even a colorable substantive due process claim, assuming he even could attempt to salvage what in effect is a fatally flawed *ex post facto* or Eighth Amendment claim as a substantive due process one, in apparent contravention of precedent. *See generally, e.g., Case v. Milewski*, 327 F.3d 564, 568 (7th Cir. 2003) ("This court previously explained that a seizure that passes muster under the Fourth Amendment should also satisfy the requirements of the due process clause. Thus, if this court upholds Case's arrest when it is reviewed under Fourth Amendment rules, Case will not succeed by recasting his challenge in the language of due process.") (citing, *inter alia, Albright v. Oliver*, 510 U.S. 266, 275 (1994); internal quotation marks and citations omitted); *McCullah v. Gadert*, 344 F.3d 655, 658 (7th Cir. 2003) ("[C]onstitutional claims should, where possible, go forward under rights rooted in an explicit textual command of the Constitution rather than more generalized notions of substantive due process.")

In addition, Vera-Natal offers no persuasive argument or authority even to suggest that he has a fundamental liberty interest in not being subjected to consecutive sentences after conviction for first-degree murder of one victim and attempted first-degree murder of another person. It is well-settled that first-degree murderers can be lawfully executed for that crime—*see, e.g., Smith v. Farley*, 59 F.3d 659, 663 (7th Cir. 1995) (collecting cases)—and Petitioner is not deprived of due process of law by having to suffer an eight-year consecutive sentence for his attempted murder of one victim in addition to his thirty-year sentence for the first-degree murder of a different person. *Accord, e.g., Washington v. Glucksberg*, 521 U.S. 702, 720-21 (1997)

(collecting cases).

      C.      Improper Dismissal of Ineffective Assistance of Counsel Claim

      In his habeas petition, Vera-Natal claims that he was denied "his fifth, sixth, and fourteenth amendment rights" when the circuit court summarily dismissed his ineffective assistance of counsel claims because it determined that there was not even the "gist" of a cognizable claim under *Strickland.* (D.E. 1 at 8-9.) Reading this claim generously, it appears that Petitioner contends that the Illinois court failed to follow Illinois post-conviction procedures by proceeding too quickly to apply the Supreme Court's teaching in *Strickland v. Washington*, 466 U.S. 668 (1984), in rejecting his ineffective assistance claim, as opposed to the "gist of a meritorious constitutional claim" preliminary standard set forth in Illinois law. (D.E. 1 at 8-9.) This claim is flawed for multiple, independent reasons.

      First, despite Petitioner's attempts to phrase this as a federal constitutional claim, the question of whether his *Strickland* claim was rejected too quickly under Illinois post-trial procedural law is not a federal constitutional claim and provides no basis for habeas relief. *See Dellinger*, 301 F.3d at 764 ("Federal habeas relief is only available to a person in custody in violation of the United States Constitution or laws or treaties of the United States, *see* 28 U.S.C. § 2254(a), and is unavailable to remedy errors of state law. *See Estelle v. McGuire*, 502 U.S. 62, 67-68 (1991)"); *Evans v. Leibach*, No. 03 C 2320, 2003 WL 21730116, at *3 n.2 (N.D. Ill. July 18, 2003) (Aspen, J.) ("Petitioner's contention that the [Illinois] appellate court should have applied a 'gist of a constitutional claim' standard instead of a 'substantial showing' standard of review fails because the existence of this component of a post-conviction proceeding is a product of Illinois state law."); *accord, e.g., Murrell*, 332 F.3d at 1111-12.

      While his initial petition did not state a federal ineffective assistance of counsel claim,

Petitioner has stated such a claim in his "Motion to Show Cause Why Petition of Habeas Corpus Should Be Granted." (D.E. 16 at 3-5.) In this motion, Petitioner argues that he received ineffective assistance of counsel, in violation of his federal constitutional rights, when trial counsel did not investigate the crime scene and develop evidence that would have supported his claim of self-defense. (*Id.*) This claim was not raised on direct appeal. (D.E. 15, Ex. B.) It was presented in Vera-Natal's petition for post-conviction relief (*Id.*, Ex. E at 4); however, it was not presented in the appeal of the circuit court's denial (*id.*, Ex. G) or in his petition for leave to appeal to the Illinois Supreme Court. (*Id.*, Ex. K.) Thus, this claim is defaulted.

Petitioner has not shown cause for the default. Instead, he argues that the default should be excused to avoid a fundamental miscarriage of justice. (D.E. 16 at 5.) This exception is "limited to situations where the constitutional violation has probably resulted in a conviction of one who is actually innocent." *Dellinger*, 301 F.3d at 767. Since Petitioner is not alleging actual innocence—there is no dispute that he shot both of the victims—his default is not excused under this exception.

Even if Petitioner's ineffective assistance of counsel claim were not defaulted, it would not prevail on the merits because it is substantively baseless. *Strickland* commands that Petitioner must show both that counsel's performance fell below an objective standard of reasonableness and that counsel's poor performance prejudiced the outcome of the proceedings. Trial counsel's decisions whether to present certain witnesses, defenses, or evidence ordinarily receive great deference because they are strategic judgment calls and because of the distorting effect of hindsight in making a *post hoc* assessment of counsel's strategic assessments. *See, e.g.*, *Strickland*, 466 U.S. at 689; *Fountain v. United States*, 211 F.3d 429, 434 (7th Cir. 2000) ("[M]any trial determinations, like so many other decisions that an attorney must make in the

18

course of representation, are a matter of professional judgment. Thus, we must resist a natural temptation to become a 'Monday morning quarterback.'") (internal punctuation and citations omitted); *Wright v. Walls*, 288 F.3d 937, 946 (7th Cir. 2002). Precedent teaches that courts generally should be loathe to question such choices—*see, e.g., Strickland*, 466 U.S. at 689 (instructing that "a court must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance . . . .")—and precedent articulates this directive even more forcefully in the context of federal habeas review. *See, e.g., Murrell*, 332 F.3d at 1111-12.

In his "Motion to Show Cause Why Petition of Habeas Corpus Should Be Granted," Vera-Natal argues that his trial counsel was ineffective because counsel failed to develop evidence that the attempted murder victim was hit by a ricocheted bullet. He argues that "the att. [sic] first degree murder charge was due to a ricochette [sic] bullet which should not constitute severe bodily injury in which the petitioner received his consecutive sentences." (D.E. 16 at 3.) This contention is, with all respect, frivolous. Whether the victim of Petitioner's attempted murder (*i.e.*, the person that Petitioner merely shot, as opposed to killed) was hit by a ricochet bullet or not is irrelevant: that victim suffered a substantial injury, requiring surgery and an extensive recovery. Nothing would have been gained by attempting to undermine the injury because the victim was shot by a ricochet bullet, nor is there any serious argument that the shot which felled the victim came from anyone other than Petitioner, as he was the only person on the scene who was armed.

Petitioner also appears to suggest that his criminal defense attorney rendered constitutionally-defective counsel by not arguing that the ricochet was evidence that the attempted murder was an accidental shooting. *See id.* ("The bodily injury which was inflicted

19

was caused by a mere accident from a ricochette [sic], and that victim was hit in the ankle as a result."). Petitioner does not address how the defense that the purported ricochet shooting of the attempted murder victim was an accident could be squared with his simultaneous killing of the murder victim. Putting that issue aside, even evidence that both victims were hit by ricochets would not have proven anything other than that Petition is not a particularly good marksman. *Accord People v. Johnson*, 771 N.E.2d 477, 487-88 (Ill. Ct. App. 2002) ("[P]oor marksmanship is not a defense to attempted first degree murder"). Petitioner shot repeated rounds—at least four (D.E. 15, Ex. B at 6, 7, 10, 12)—at a group of rival gang members while closing in on them. When doing so, he was the only armed person on the scene, having elected to bring a pistol on his bike ride to the gas station. He was dressed in clothes signaling his own gang membership and his animosity towards the other street gang in which his targets were members. After the shooting, Petitioner fled the scene and quickly traveled under an alias to Puerto Rico. He was forcibly returned to Illinois, having made no arrangements to return, only after he was arrested on unrelated charges and extradited back in custody to Illinois. Under those circumstances, there is no straight-faced argument that his counsel could have advanced that the shooting was an accident. Moreover, defense counsel could not have made this "accidental ricochet" argument and coherently advanced Vera-Natal's claim of imperfect self-defense, as the two theories are inconsistent explanations for the shooting. Trial counsel pursued a strategic call that pleading imperfect self-defense was a better option. *Strickland* affords great deference to the strategic decisions of trial counsel, and in the Court's view (for what it is worth, given that courts are directed not to readily second-guess criminal defense counsel), the strategic option pursued surely seems like the sounder and more promising of the two options available.

The only Illinois court to which Petitioner presented his ricochet-bullet theory dismissed

it on the grounds that even if there were ricochets, "this fact would not change the result of the trial where the defendant intentionally fired shots toward a van in effect spraying the van with gunfire." (D.E. 15, Ex. F at 14 (citing Illinois Court of Appeals opinion rejecting Petitioner's direct appeal (D.E. 15, Ex. B at 2, 30) (internal quotation marks omitted)).) Petitioner presents no credible claim that the Illinois court erred, much less that the court unreasonably applied the *Strickland* standard. Petitioner's *Strickland* claim is respectfully rejected.

## CONCLUSION

For the reasons stated above, federal habeas relief is not warranted. Consequently, the Petition for a writ of habeas corpus is denied.

So ordered

Mark Filip
United States District Judge
Northern District of Illinois

Date: 11/7/05